Good morning, Your Honor. Sir, are you going to reserve some period of time? Yes, sir, if the Court pleases, four minutes of time. That's granted, of course. Go ahead, sir. May it please the Court. My name is Paul Honigberg, and I represent the Plaintiff Appellant, Carl Schuman, suing on behalf of the United States of America. We seek reversal of the District Court's orders granting the defendants' motions to dismiss for lack of subject matter jurisdiction based on the public disclosure bar of the False Claims Act. Specifically, the District Court's holding that Mr. Schuman did not come within the original source exception to the public disclosure bar. The District Court held that Mr. Schuman was not an original source because, in the Court's view, he lacked direct and independent knowledge of the entire fraudulent scheme. The Court erred in the following respects. First, the Court applied an incorrect legal standard requiring Mr. Schuman to plead that he had, quote, obtained direct knowledge of the ultimate fraudulent conduct, close quote. The Court failed to credit the allegations of the Fourth Amendment complaint and concluded that Mr. Schuman had only alleged direct and independent knowledge of discounts and legitimate price negotiations rather than direct and independent knowledge of fraud. The District Court ignored large swaths of the Fourth Amendment complaint that, when read with the paragraphs describing meetings, negotiations, and other communications, explained the basis of Mr. Schuman's direct knowledge of the most critical element of the fraud. In other words, we just failed to connect the dots. Well, let me ask you a technical question. The declaration that was appended to the motion for reconsideration, can we consider that now? Well, Your Honor, it depends. We don't know to this day how the District Court treated Mr. Schuman, the challenge to Mr. Schuman's status as an original source. If it was a facial challenge, you wouldn't consider that declaration, but the District Judge should have accepted everything in the complaint as true and all the well-plaid averments as true for purposes of determining jurisdiction. If it was a facial challenge. You mean factual? You said facial before. Facial before. If it was a factual challenge, thank you, Your Honor, then the Court should have considered the declaration, simply because the District Judge vacillated between, on the one hand, describing it as a pleading issue and, on the other hand, saying that he hadn't pled his direct and independent knowledge, but then on two occasions saying he hadn't offered competent proof of his status as a relator. So we actually think this was a facial challenge. But it had to be a factual challenge, didn't it? No. It had to be a factual challenge because there was more at issue than whether he was an original source. There was also at issue the question of whether there was a public disclosure. That had to come from outside the complaint. Your Honor, we agree. As to the public disclosure, we agree that that was a factual challenge. It was supported by articles and cases. But then as to the original source exception. So you have a factual challenge to part and a facial challenge to another. That is what the District Court said it did some of the time, and most of the time that's what Bristol-Myers says occurred with respect to original source. AstraZeneca seems to want to have it both ways. So that's what we think of these declarations. Having found that Mr. Schuman – I'm sorry. I'm going to interrupt you. Go ahead. I'm less scratching my head at the moment. So facial, factual, where does that leave us with the declaration? May we consider it or not? If – On the key original source issue, I presume your answer would be it should be considered. On the public disclosure issue, it was considered. So it was factual. On the original source issue, we think if the Court accepts that it was a factual challenge, if the Court deems this a factual challenge, then it must consider those declarations simply because if the defendants are putting in matters outside of the pleadings, then Mr. Schuman gets to put in matters outside the pleadings. But why wasn't – I guess it's an obvious answer, but why wasn't it put in before a motion for reconsideration? I understood Judge Ditter's rationale to be it came too late. It's not new evidence. Well, we're talking about two declarations here. Okay. As to the BMS, the Bristol-Myers declaration, that was not put in originally because based on the brief submitted by Bristol-Myers, it appeared to be a facial challenge. And they said it was a facial challenge in their brief regarding the motion for reconsideration. Once the district judge threw in those magic words, competent proof, all of a sudden we said, oh, wait, he's treating it as a factual challenge, so maybe we better put in an affidavit. As to AstraZeneca, having been, you know, having been informed as to how this would go, when AstraZeneca moved to dismiss, we put the declaration in the first time around with our opposition, and Judge Ditter acknowledged it, but the district court, you know, really didn't discuss it at all, just disregarded it, lending further credence to our notion that he had treated this as a facial challenge. But had the district judge looked at Mr. Schuman's declaration supported against – he would have seen that this characterization of Mr. Schuman's attending meetings where all they discussed were price and benign discounts. He would have seen that Mr. Schuman said – Wouldn't the argument be the same? In the first instance, the declaration that was appended to the motion for reconsideration, the district court said with regard to that declaration that it was deficient. And it said that it was deficient because it lacked the specificity, the how, when, where, why, and so forth. If that were so in – I understand you disagree with that assessment, but wouldn't that be so in the first instance as well as the second instance? And if so, what's your response to that? Give us what is already in there that should lead us to a different conclusion than the district court had. Just to make sure I understand, Your Honor, what's in the complaint or what's in the declarations? Well, in the motion for reconsideration of the BMS, there was an assessment of what was in the declaration, right? And the assessment was that this is the same as the complaint. It's deficient because it's not giving the how, what, where, and when of what Mr. Schuman knew. So therefore, there's nothing new. I'm not crediting it. Therefore, I come to the same conclusion. Respectfully, Your Honor, the first time the judge ruled on the BMS motion, there was no declaration. So he was talking at that point. No, no, no. I'm talking about the motion for reconsideration. Understood. So on reconsideration, the district judge basically said, I'm not going to consider this. It's not newly discovered evidence. The district judge, as I read the opinions, I didn't see the district judge even allow that declaration to be considered, if I recall correctly. He basically said it's not newly discovered evidence and I'm not going to consider it. And my memory may be imperfect, but had the district judge looked at the AstraZeneca declaration, he would have seen that Mr. Schuman described the basis of his direct and independent knowledge of AstraZeneca's conduct. For example, paragraph 18 of Mr. Schuman's declaration talked about almost 18 months of negotiations over the addition of Nexium, the follow-on drug, to Medco's formularies and of his addition to the formularies of the trophy accounts United and Highmark. Mr. Schuman stated, as part of the negotiations in which I participated, AstraZeneca made clear that at least two purposes of the agreement would be, A, to provide monies to induce Medco to convert proton pump inhibitor users to Nexium, and B, conceal purchase discounts to Medco so that AstraZeneca would not have to include these discounts in its reported best price for Nexium. In paragraph 19, he recounts Mark Mallon, AstraZeneca's lead negotiator, along with others from AstraZeneca, meeting with Schuman and Medco colleagues in order to determine what concessions from AstraZeneca would be required in order to induce Medco to add Nexium to its formulary. Paragraph 19 recounts another meeting with two AstraZeneca employees to present AstraZeneca's proposal for a five-year deal adding Nexium to Medco's formulary. Medco would receive significant rebates for adding Nexium to the formulary. AstraZeneca would pay rebates on Prilosec for the life of the product, and for the trophy accounts, AstraZeneca proposed additional price concessions. But do we know that they actually did that? Excuse me, Your Honor? Do we know if they actually did that? Well, Your Honor. Even if they talked about it? Well, Your Honor, well, Mr. Schuman can't know if they actually did that, but Mr. Schuman had them telling him in these meetings that we just recounted why they were doing it. Okay, if you can't know that they actually did that, then aren't we ñ you know, we take the equation X plus Y equals Z. You're familiar with that one. I am familiar with that algebraic equation. Okay, so if Y are the fraudulent acts that the drug companies say they're going to do, but he doesn't know that they actually did them, don't we have a problem with the equation? No, Your Honor. If X is the ñ Public knowledge. No. Well, I mean, X plus Y equals Z is a public disclosure formula. Yeah, okay. But if X is the fact that they were getting paying kickbacks in order to have their drugs put on the formula ñ Well, they're talking about it, but were they really doing it? Well, I think, Your Honor ñ As they related to the government, as they related to the prices reported to the government, as they related to whether these promised benefits were legal promised benefits or illegal promised benefits. Your Honor, we're talking about jurisdiction and whether he's an original source. Right. And when AstraZeneca employees come to a meeting with him or BMS employees come to a meeting with him and negotiate large discounts well beyond the Medicaid discounts, and then say we have to disguise them so we don't have to give the discounts to all the states participating in Medicaid, that's enough for original source given this court's jurisprudence that a relator need not to know every aspect of the fraudulent scheme in order to be an original source. But do we know that they're ñ even though they said they described what might be a fraudulent scheme, do we know that there actually was the fraud committed? Your Honor, that goes to the merits, perhaps a summary judgment some day. Well, no, I think it's inextricably mixed up with whether that we have an original relator or not. Well, but a relator ñ again, Your Honor, this court has said for 20 years that a relator need not have direct and independent knowledge of every aspect of the scheme. And it seems to me that that aspect of the scheme, whether or not they actually did what they told him they were going to do, I don't think that affects his status as an original source. But isn't the district court's criticism of Mr. Schuman that, yes, there are at points in time some knowledge, but essentially there isn't a continuum, there isn't a connection of the dots over time? Well, the district judge felt we didn't connect the dots. The district judge was basically saying because he couldn't ñ he wasn't a direct ñ didn't have direct and independent knowledge of every aspect of the fraudulent scheme, including, according to the defendant submitting the false claims, that he's barred from being a relator as a matter of law. This court's jurisprudence, we know from Peronich that if you're involved in some aspect of the scheme, you can be a relator. You have ñ Isn't there a distinction between Mr. Schuman's involvement here on the one hand and the involvement in Peronich? Is there a ñ I mean, Peronich ñ I mean, Peronich ñ He seemed to be, like, involved. Well, I mean, as this court said, Dr. Peronich was an original source. He had direct and independent knowledge because he was involved in it. Similarly, we've pled in the Fourth Amendment complaint that Mr. Schuman, the negotiator for Medco, was involved directly in this scheme to pay kickbacks to get these huge discounts. But isn't one of the criticisms at the district court levels that there was so many levels of negotiation that preceded Mr. Schuman's involvement that you can't argue now that he was as integrally involved as you argue now? Well, I mean, he was involved with Bristol-Myers, and I see I've exceeded my time, but I'm happy to answer these questions. He was involved in continuation ñ We're happy to. Good. You know, as far as BMS goes, he was not there when the original agreement was negotiated. But as this court recognized in Stinson in its citation to the Seventh Circuit case, how a relator can still have direct and independent knowledge if it comes in ñ if he or she comes in later and help implement some important aspect of the scheme. But doesn't that go now to Judge Roth's question? I mean, if you want to take credit for implementation, you've got to not just be there. You've got to know that there was some follow-through. Well, I mean, not according to this court's cases going back over 20 years. I mean, you need to know, according to Mystic, the defendant's best case is Mystic. You have to know the most critical element of the claim. Well, the most critical element of the claim ñ If there was such a claim. I mean, it's called the False Claims Act. But are we sure that there was a false claim submitted by the drug companies? When we don't know the ultimate transactions between the drug companies and the government or between the methods of providing assistance, whether they were, quote, kickbacks, unquote, or whether they were permitted assistance that the drug companies could offer. Respectfully, Your Honor, that goes to the merits of the claims, not whether he's a direct and independent source. Okay, it goes to the merits of the claims, but it also goes to whether Mr. Schuman is an original relator. If he doesn't know whether the ultimate claims were fraudulent claims. Well, Your Honor, that would represent a change in this court's precedence, to say that he has to know about the ultimate claims. Because if that is the rule, then this court is basically saying that to be a relator, you have to know about the submission of the claims. You have to know that there was a false claim. Well. You have to know that there was a false claim. Was there a false claim? Well, Your Honor, we certainly allege that there was. And, you know, this being a facial challenge, the district court was required to accept the allegations of the Fourth Amendment complaint as true. If it was a facial challenge, then the district court was required to look at Mr. Schuman's declarations. And it's important to note that the defendants did not put into the record an argument that he didn't have direct knowledge. They basically went off on public or that he didn't have independent knowledge. They basically went off on public disclosure and said because he didn't have knowledge of every aspect of the fraudulent claims, including the submission of the claims, he couldn't be a relator. That would represent a change in this court's precedence going back 21 years, and it would harm the balance that this court recognized in Stinson and Dunleavy in the False Claims Act, which was to encourage relators to come forward and report fraud, while discouraging purely derivative or, as the court said, purely parasitic claims. No one could be a relator under this standard, Your Honor, unless – and even the person submitting the actual false claims couldn't be a relator because they weren't involved in the kickbacks. So this – If there were kickbacks.  If there were, in fact, kickbacks. That's true, but we allege there were kickbacks. Right, but this is not the alleged false claim. This is a false claim that the relator is coming to tell the government about. It was made to the government. But don't we have to know that there was, in fact, a false claim? No. Respectfully, no, Your Honor. That puts the cart before the horse. The relator comes forward with his or her knowledge. The government has 60 days, and in this case six years, to conduct its investigation, and then it makes an intervention decision, and then the relator gets to go to the merits of the case. This is subject matter jurisdiction at the pleading stage, and while we understand the relator bears the burden of proving jurisdiction on a facial challenge, which this was, the court had to accept as true the allegation that there were false claims pled in our complaint repeatedly that there were false claims. All right, thanks so much. Thank you. Ms. Stetson. Good morning, Your Honors. May it please the Court. I'm Kate Stetson. I'm going to speak for eight minutes regarding Apelli BMS. Mr. Haddad will then speak for seven regarding AstraZeneca. With your permission, I'd like to go right to Judge Greenaway, your first question, involving this facial versus factual issue and this motion for reconsideration that was filed with the late filed declaration, and I want to see if I can help untangle this facial versus factual business. I actually think it's somewhat a tempest in a teapot because of the very last thing that you just heard Mr. Honeyberg say. What Mr. Honeyberg closed with was that he understands, as we do, that the relator always bears the burden of establishing subject matter jurisdiction. So when it came to challenging the fifth iteration of the complaint in this case, what both BMS and AZ did was to challenge subject matter jurisdiction in a couple different ways. They established, BMS established, that all of the allegations in Mr. Schuman's complaint, his fifth complaint, had been publicly disclosed. That issue is actually no longer in front of this Court on appeal. Mr. Schuman's conceded it. The next question is, was he an original source? And let's remember, that's the only reason we're talking about this issue. All of these claims had been publicly disclosed. And when that happens, under the False Claims Act, the only relator who gets to come in and claim a piece of that governmental prize is the kind of relator that can claim direct and independent knowledge of the allegations on which those claims are based. So then the question is, did Mr. Schuman establish in his fifth complaint enough detail to show that he was an original source, that he had the kind of direct and independent knowledge that this Court and all the other courts require before somebody can qualify for that kind of narrow status? BMS challenged his allegations as insufficient. Now, because the burden was always on Mr. Schuman, Mr. Schuman then had a choice. He could do one of two things, or both. What he could do first was to say, I have said enough in my complaint. This is the fifth time I have pled these claims. I have said that I am a direct and independently knowledgeable source. Look at paragraphs 54 and 55 of my complaint QED. He also, at that stage, as many relators do, could have said, but if you don't buy that, here's what else I have to offer. Here's all of the other detail and accessories that I can put on my particular knowledge of these particular discount negotiations. Here it is. And he could have done that in his opposition to the motion to dismiss. He could have done that in his surreply. He could have done that at the hearing. He could have done that in some of the letters that were exchanged before and after the hearing in front of Judge Ditter. But he never did it. So at the point where Judge Ditter dismissed Schumann's complaint against BMS with prejudice, and let me pause on that, too, because that wasn't a surprise. That was actually a bolded last heading in BMS's motion to dismiss the Fourth Amendment complaint. The complaint should be dismissed with prejudice. He's had five tries. It's time to dismiss it with prejudice. So at the time Mr. Schumann comes back in, in his motion for reconsideration, and says, wait, here's my declaration. Also, please permit me leave to amend. This becomes a very common, straightforward exercise of discretion on the part of a seasoned district judge to deny that late request for leave to amend, to decline to look at that reconsideration, that declaration submitted in support of reconsideration. And on top of that, Judge Greenaway, to your question, even if you do look at that declaration, it's not going to add anything to the analysis for the reason that the only thing that Mr. Schumann himself knows has to do, and Judge Roth mentioned this as well, with negotiations about discounts. Discounts are not illegal. That's what PBM's pharmaceutical benefit managers do. They negotiate discounts. What's the distinction between Schumann's involvement here and Peronich? Mr. Honigsberg says that he's integrally involved, he's directly involved, as was the case in Peronich. Right. What's the distinction that you would draw? Well, I think you struck on the distinction, too, because in Peronich you said Mr. Peronich was involved. He was involved because he submitted the claims for reimbursement. That case involved a type of e-STEM or electronic stimulation machine. Mr. Peronich was submitting claims for reimbursement to the federal government, claiming that they were a type of injection. Injections got paid for several times more than an e-STEM payment would be. That's the involvement that Mr. Peronich had. But in any event, Peronich went off on the voluntary disclosure issue. But to the extent that there's any parallel to be drawn, I think Peronich only points out what's missing here, which is, Judge Roth, to your point, the only thing Mr. Schuman knew was that discounts were being negotiated. That was part of his job at MEDCO. He was in the room while discounts were being discussed. The problem, though, just to turn to the X plus Y equals Z issue, is that Mr. Schuman doesn't know X or Y. If you think about it, and I think this equation helps only as far as it goes, because then you have to add context to it. But if you talk about the X as being the true set of facts, there was a kickback. This wasn't the best price. And you think about Y as being the false state of facts. We didn't give kickbacks. This is our best price. Z is the fraud, obviously. Mr. Schuman didn't know either X or Y. If you look at Joint Appendix 33, there is a sentence in Judge Ditter's reconsideration ruling, which I think actually very sharply points out the problem that Judge Ditter found with this case. I'm going to quote it. Where Mr. Schuman has alleged facts of which he has direct and independent knowledge, he does not allege fraud. And where he alleges fraud, he does not allege facts of which he has direct and independent knowledge. That's the problem, because it's not enough under this Court's precedence, under Mystic, under Stinson, for Mr. Schuman to come in and say, I was a peripheral participant in a discount contract negotiation. He has to establish more than that. And just to return back to this facial versus factual issue, which in the end doesn't matter, the district judge, both in his opinion and in his opinion reconsideration, at Joint Appendix 29, explained exactly what he did. He took Mr. Schuman's allegations as true. What Mr. Schuman didn't do was to explain how he directly and independently knew that these data agreements were bogus or a sham, that the discounts were actually secret rebates. That was what was missing. So it's not, it never was incumbent on the district court, for the district court to send some special notice to Mr. Schuman saying, you understand, and of course BMS did, you understand that BMS is challenging your original source allegations as insufficient. Now is the time for you to come forward and support it. So let me ask you this question. I just want to have clear in my mind what degree of participation one would have to have, right? Right. So you're in the room, you see what's going on, but you're not a player in the room. The negotiations are going on in front of you, but you're not a participant in them, right? In that scenario, if you came forward with the evidence of what went on in the meeting, as long as you knew what the end game was, then you would satisfy the prerequisites to be a relator, yes? Well, I'm going to push back on that only a little bit. You know, you say, and I know my time is up, and I hope my answer won't cut into Mr. Haddad's time. No, he'll get his time. Okay, all right. All Mr. Schuman ever alleged, and you can see this at paragraph 54 in his fifth complaint, is people told me what was going on. You know, I got to MEDCO after these agreements were signed, but I heard from colleagues. I understand that his hypothetical is slightly different. Right. That his facts are different than my hypothetical. Right. But I want an answer to my hypothetical first. Sure. So the answer to your hypothetical is, assuming that, you know, he directly and independently understood that there was a fraud being committed because of the negotiations in that room, you might get closer to establishing, again, that narrow qualification of original source status. But here's the problem. You know, Mr. Honeyberg speaks in terms of dot connecting. He says, all you need to do is look through this complaint and connect the dots, and the district judge declined to let us connect the dots. The district judge applied exactly the right standard. What he said was the coupled dots that Mr. Schuman knew about were irrelevant. He didn't have the essential elements of this fraud, and he never required Mr. Schuman to establish all of the elements of a fraud. That's not the standard. Judge Ditter knows it. This court knows it from Stinson. What this court looks for is, did this relator come forward and establish that he or she had direct or independent knowledge of the essential element of the fraud, either the false set of facts, fraud, kickback, false best price, or the true set of facts, no kickback, or vice versa, true set of facts, kickback, best price. Here, all Mr. Schuman did was say, I was in the room. He didn't connect the dots because he didn't have direct and independent knowledge of any of the rest of the dots. Well, would you say he was in the room at a preliminary stage, but he was not in the room at the final stage in which a fraudulent act was committed? I think that's one way to look at it, Your Honor. But I do think that it's possible for someone to be, hypothetically, a relator without being parentage, without actually submitting the false claim himself. But the problem here is that Mr. Schuman can't show any of the kind of fundamental prerequisites to that fraud. He can't show X or Y, knowledge, direct and independent of X or Y. He's got all sorts of detail about the X and Y, but where his fifth complaint falls short is in establishing that he directly and independently came into possession of that detail. Not that somebody told him, not that he figured it out, not that 10 years' worth of news coverage didn't do it for him, but that he knew. And that's his problem, and that's why the district court should be affirmed. Thank you so much. You didn't have anything more for her. You didn't have anything more for her. Thank you. I'll let you know. Yeah, yeah, yeah. Good morning. Good morning, Your Honor. May it please the Court. My name is Mark Haddad, representing AstraZeneca. Let me start with perhaps a concrete example just to further develop why Mr. Schuman cannot be deemed a relator with direct and independent knowledge of either the best price claims or the service agreement claims. Let's start with the best price claims. The best price is something that a company different than the company he worked for, Medco, provides to the federal government. AstraZeneca and BMS were companies that sent best price reports to the government. They did so quarterly. Now, the best price report is a report that identifies the lowest price that a qualified recipient got for a particular drug during that quarter. Medco is but one of multiple pharmacy benefit managers with whom AstraZeneca and other drug manufacturers negotiated. The Court can see that AstraZeneca is but one of many if it reads the public disclosures in the U.S. News and World Report, the Wall Street Journal, the Philadelphia Inquirer. They laid all of this out. They talked about another PBM executive, a Mr. Purcell, who had been reporting his concerns well over a year before this relator came in with his complaint. Now, the relator does not know which PBM, let alone if it's Medco or not, is setting the best price. It doesn't know how AstraZeneca is calculating the best price. It doesn't know how AstraZeneca is accounting for whatever deals its negotiators bring back from the different PBMs. All this relator knows is what negotiators, who of course are trying to get the best deal they can from Medco for AstraZeneca, are saying in negotiating meetings. That's the most that he knows. So he is not in a position to overcome the public disclosure bar, which he has neatly tried to evade the significance of by not challenging on appeal, but which this court has to look at. So if this court looks at the articles, which, for example, we've cited, they're in the joint appendix, the U.S. News article at 1866 of the joint appendix, or the Wall Street Journal article at 1849, or the Philadelphia Inquirer article, the court will see the basics are laid out. Medco is not even the largest PBM. Well, let me ask you this question that's slightly off the topic that you're raising, and that is Mr. Honigsberg has argued that if we were to affirm that would be a departure from our jurisprudence over the last 25 years, and he's obviously alluded to several third-circuit cases. Can you comment on that and tell me what the flaw, from your perspective, is of his argument? Yes, Your Honor. First of all, we argued the Atkinson precedent extensively in our brief. He did not respond to it, and there's a reason. The X plus Y analysis in Atkinson maps directly onto this case. I think it's discussed several times in Atkinson. I think at 526 to 527 of Atkinson, you see the clearest framework that you can apply here. The X is the fact of a false claim. The X is that, in our case, AstraZeneca submitted a false best price report to the government. He does not know X. He admitted it this morning. He admitted it in briefing before the district court. He says these issues weren't briefed. His declaration against AstraZeneca was extensively and repeatedly briefed. It was in one of his surreplies to our arguments that he admitted that he didn't know whether the best price reports were false or not, and the ECF brief is cited on page 19 of our brief. So he doesn't know the X. He also doesn't know the Y, and that's critical. The Y is AstraZeneca's knowledge, AstraZeneca's scienter in entering into these agreements. All he knows is what the negotiators are saying, but he doesn't know how AstraZeneca is calculating the best price or what they're taking into account. And then the other part of the case involves the service agreements, and the reason his declaration adds nothing, if you look at the declaration with regard to the service agreements, he's not in the room, even with AstraZeneca on the service agreements. What he knows about the service agreements is what others at Medco were telling him, or others at Highmark were telling him about the service agreements. So his knowledge about the service agreements is secondhand. It's not AstraZeneca's scienter. He's making predictions based on his expertise in the industry. That's what the relator in Rockwell did. He made predictions based on his expertise, and the Supreme Court said that does not suffice for direct and independent knowledge. And the same is true here. So it would actually be this case that would be the departure from this Court's precedence in Atkinson, in Stinson, and also in Pranich for the reasons Ms. Stetson explained, where there it would be as if you had a relator who was submitting false claims for AstraZeneca, and then said, and I think BMS is submitting them too, or something like that, and trying to expand it. That's the analogy to Pranich. Here you have someone who doesn't know whether false claims were submitted or not, not somebody who actually submitted them on his own behalf, and then got subpoenaed by the government to find out more. So this case lines up directly with this Court's precedence, which you will not find argued in the other side's brief, but which you will find laid out in our brief and with Rockwell. On the facial versus factual, just to clear that up for AstraZeneca, he did decide to put in a declaration in opposition to our factual challenge. So it's clear ours is a factual challenge. It's clear it was extensively briefed and considered by the District Court. When the District Court says on JA55 with respect to AstraZeneca that all the relator does is recount his participation in meetings, that's as true of the declaration as it is of the complaint. And it's important because, for example, this is not a price-fixing case. If this were a price-fixing case under the antitrust laws, you'd be very much concerned about competitors getting together in a room. That would be meaningful because competitors can set prices independently. What they can't do is get together in a room and discuss the prices they're going to set. PBMs, however, and manufacturers are supposed to get together in rooms and discuss prices. So what he knows is collateral to fraud. It is not fraud. Unless the Court has further questions. Thank you so much. Thank you. I'll take care of it. May it please the Court. Addressing AstraZeneca's comments first. Medco may only be one of many PBMs, but it was a very influential, very large, and very important PBM. So that's why it was important. Now, AstraZeneca spent a lot of time on X plus Y equals Z and eloquently proved there were public disclosures. But as both defendants have pointed out, we're not appealing the public disclosure aspect, only the original source aspect. AstraZeneca cites the Rockwell case. The relator Stone and Rockwell, it was pretty clear, was not involved at all in any part of the fraud. He basically predicted based on things he knew. Unlike Mr. Schuman, who was at the table, participating in the negotiations both with the defendants and in AstraZeneca's case with Highmark and United. Well, here's what I don't understand about what you're saying that he was in the room. And correct me if I'm wrong in my sort of basic understanding of this. According to the district court, there's a period of time in which there are negotiations going on based on what the allegations are in the complaint, that Mr. Schuman is not a participant. Then there comes a period of time when he is. And as I think has become clear in the back and forth between you and Judge Roth, there is, if you will, an endgame that Mr. Schuman is not privy to. So there are periods of time, if you will, in the continuum where he's not involved and he's extrapolating, he's deducing, he's inferring what went on both before and after his participation. If that's so, then why doesn't that, in and of itself, create a factual scenario that's distinct from Paranich and the other cases that are part of our jurisprudence such that an affirmance makes perfect sense? Well, Your Honor, there's no rule in this court that you have to submit the claims in order to be a relator. And even counsel for BMS would not go that far. But I think, Judge Roth, the point with you is slightly different. She did allude to submission of the claims, but it's really the integral knowledge of the fraud, if you will. Well, we think, I mean, I have, obviously he doesn't have direct and independent knowledge of what came before. But when he's at the table negotiating a continuation of the agreement with BMS, he certainly has direct and independent knowledge of that. It doesn't say you have to be there at the dawn of the fraud. It only says you have to be involved in the most critical element of the fraud. And here the most critical element is the kickbacks. And addressing Judge Roth's concern from my argument, as we argued on page 11 and 12 of our reply brief, with citation of the United States v. Grieber, a Third Circuit case from 1985, the kickback offer alone is illegal. Whether or not they actually submit the kickbacks is irrelevant. The kickback offer is illegal, and it violates the anti-kickback statute, and that violates the False Claims Act. So we propose a rule, if you consider a rule, that when a person is integrally involved in some important aspect of a fraud, either the inception, the continuation, the implementation, the perpetuation of the fraud, that that person has the requisite level of direct and independent knowledge to be a relator. I'm not sure how much more direct Mr. Schuman's participation could have been in this case, Your Honor. He was at the table. He was in meetings with employees of the defendants where they admitted doing these things that if they're kickbacks, they're illegal per se. Mr. Schuman was not the cryptographer hypothesized in Stinson. Someone who translated a document from a public court record and then claimed original source status. Or the relator in Rockwell who guessed at a problem that really wasn't the problem. This is not background information. This is certainly not someone whose information and knowledge derives solely from public disclosure. Mr. Schuman had direct independent and direct knowledge of this because he was involved in it. And I just would close by remarking on this court's statement in Wilkins. You know that in denying the plaintiff's motion for reconsideration as to BMS, the district court made a finding that the negotiations were benign price negotiations that happened every minute of every day between buyers and sellers. The district judge impermissibly resolved this fact dispute adverse to the plaintiff at the pleading stage. It ignores, as this court recognized in Wilkins, that those who make claims on federal health programs must comply strictly with the requirements of those programs. As Justice Holmes said almost 100 years ago, men must turn square corners when they do business with the government. When defendants like AstraZeneca and BMS cut corners, they should be called to account. It's important for the U.S. government to have agents like Mr. Schuman available to alert it to fraud and quitom cases. All right. Well, thank you all. This case was well-briefed and certainly well-argued this morning. Would you all provide us with a transcript? That would be very helpful. Thank you very much. Have a good day.